UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAVON MACK,

    Plaintiff,

v.

WAYNE COUNTY COMMUNITY
COLLEGE,

    Defendant.

Case No. 18-13986
Honorable Laurie J. Michelson

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [16]**

After a scuffle with an African-American coworker, Lavon Mack[1] was fired from his job as a maintenance worker at Wayne County Community College ("the College"). Mack sued the College, alleging a hostile work environment and claiming that he was terminated because he is black. The College counters that it fired Mack not due to race, but because he failed to list a felony conviction on his job application. And it disputes that a single statement from Mack's coworker amounted to a hostile work environment under Title VII. Since no reasonable jury could find in Mack's favor, the Court grants summary judgment to the College.

**I.**

Mack applied for the maintenance job on August 26, 2016. (ECF No. 16-3.) The application asked, "Have you ever pled no contest to, pled guilty to, or been convicted of a crime other than a minor traffic violation?" (*Id.*) Mack answered, "No," and he signed his name under a statement saying that "supplying false information shall be sufficient cause for termination." (*Id.*;

---

[1] Although counsel listed plaintiff's first name as "Levon" in the complaint, the record indicates that his name is "Lavon." The case caption has been corrected accordingly.

ECF No. 16-3, PageID.180.) In fact, Mack had been found guilty in 2007 of a felony count of attempted delivery or manufacture of a controlled substance. (ECF No. 16-11, PageID.234; ECF No. 16-2, PageID.134.) It is unclear if the College actually performed a background check when Mack submitted his application, but three days later, Mack began working as a facilities operator at the College's downriver campus. (ECF No. 16-4.)

An early dispute between Mack and the College occurred after Mack told his union president, Alan Fortune, that he was being assigned tasks above his "G-4" classification without getting extra pay. (ECF No. 16-2, PageID.141.) According to Mack, he was performing projects at a "G-11" classification (such as painting ballasts) rather than G-4 tasks (such as repairing walls and installing electrical lines). (ECF No. 16-2, PageID.140–143.) So Fortune emailed Anthony Arminiak, the campus president, who sent a letter to staff that Mack should only be given tasks at the G-4 level. (ECF No. 16-2, PageID.141–142.) After that point, Mack says he was given menial tasks such as mopping and weeding. (ECF No. 16-2, PageID.147, 151.)

Tensions escalated further when Ethel Cronk, the College's regional provost, called Mack into her office and accused him of calling her a "racist" behind her back. (ECF No. 16-2, PageID.146.) Mack denied using that word, but he told Cronk, "I said you was biased against me because I get all the S-H-I-T jobs." (ECF No. 16-2, PageID.147.) On February 6, 2018, the matter between Mack and Cronk came to a head. In Mack's recollection, he approached Cronk in the parking lot when she was leaving and asked what he could do to get back in her "good graces"; Cronk said they could talk the next morning and drove away. (ECF No. 16-2, PageID.155–156.) Cronk recalled the events somewhat differently, which she memorialized in an email that she sent to Arminiak the next day. She told Arminiak she was "concerned" about the interaction because Mack "followed me out of the campus to talk to me about items that he could have approached me

2

with while I was in the building. I didn't know that he was behind me until I was in my car." (ECF No. 16-6, PageID.218.) In addition, Cronk felt "concerned with my safety" and requested that campus security escort her to her car at the end of each day. (*Id.*)

Two months later, Mack was transferred to a position at the College's downtown campus, where his pay, hours, and duties remained the same. (ECF No. 16-2, PageID.160; ECF No. 16-7, PageID.220.) Arminiak told Mack that he made the transfer because Mack would not stop socializing with a certain coworker. (ECF No. 16-2, PageID.158.)

As described by Ron Offett, Mack's supervisor at the downtown campus, Mack worked there as "a maintenance man" who was responsible for groundskeeping tasks like changing lightbulbs and checking on heating systems. (ECF No. 16-5, PageID.208–209.) Offett, an assistant facility director, did not have the power to hire and fire employees. (ECF No. 16-5, PageID.191.)

Between April 10 and July 6, 2018, Mack had at least two confrontations with Melvin Walker, a coworker at the downtown campus. Walker, who also is black, was significantly younger than Mack but had much more seniority at the College. (ECF No. 16-8, PageID.222; ECF No. 19-3, PageID.346.) On one occasion, Walker addressed Mack in a derogatory manner, calling him "a hoe ass nigga." (ECF No. 16-2, PageID.161.) Mack says that Offett overheard Walker's comment and told him to "ignore" Walker because he is "just a hothead." (ECF No. 16-2, PageID.161–162.) (Although the Court credits Mack's allegations at this stage of litigation, Walker said in his deposition that he had never used "the N word" at work. (ECF No. 19-3, PageID.366.) In his deposition, Offett denies overhearing the alleged comment and says he would have reported an employee who used a derogatory term. (ECF No. 16-5, PageID.207, 212).)

Mack notes a second, and more physical, altercation with Walker that occurred on July 6, 2018. Mack was standing by a loading dock on the campus and putting together a bookshelf when

Walker "forced his way past [Mack] and grabbed [his] elbow." (ECF No. 16-2, PageID.163.) Walker reported the interaction to campus police and gave a statement that contradicted Mack's story. (ECF No. 16-8, PageID.222.) According to the case report, Walker brushed Mack's shoulder and said "Excuse me," to which Mack responded, "Don't fucking touch me." (*Id.*) Walker agreed in his deposition that tension already had existed between them, perhaps because he had been "showing [Mack] the ropes." (ECF No. 19-3, PageID.357–358.) Later that day, Mack also gave a statement to campus police in connection with Walker's report. He alleged that Walker grabbed his elbow "and forced his way by [him] in an aggressive manner." (ECF No. 16-8, PageID.227.) Mack recalled telling him, "Don't put your hands on me again." (*Id.*)

On July 9, 2018, the College placed Mack on administrative leave with pay while it investigated the report. (ECF No. 16-9, PageID.230.) That same day, as part of its investigation, the College obtained Mack's Michigan Criminal History Record, which revealed his 2007 felony conviction. (ECF No. 16-11, PageID.234.) Then, in a letter dated August 1, the College fired Mack "for violation of [College] Policy." (ECF No. 16-12, PageID.238.) The letter explained: "During an investigation regarding [the July 6] incident it was found that you violated [College] policy/procedure." (*Id.*)

In response, Mack filed this lawsuit. His amended complaint alleged that the College "created a hostile and degrading environment towards African American employees" and that he "suffer[ed] unfair treatment . . . based, at least in part, on the unlawful consideration of [his] race." (ECF No. 8, PageID.40–41.) Mack asserted violations of Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"). (ECF No. 8, PageID.41–42.) The College moved for summary judgment, arguing that Mack cannot make out a discrimination case. (ECF No. 16.)

As explained below, the College is entitled to summary judgment on all counts.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if its resolution will affect the outcome of the lawsuit." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451–52 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a "dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516 (6th Cir. 2019) (internal citations omitted).

## III.

### A.

Title VII bars employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Courts generally analyze ELCRA claims under the same framework as Title VII claims, *see Ondricko v. MGM Grand Detroit, LLC,* 689 F.3d 642, 652 (6th Cir. 2012), and the parties here apply the same legal framework for the state and federal claims. A plaintiff may demonstrate discrimination by direct or indirect evidence. *See Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019). Here, Mack claims that both direct and indirect evidence could convince a jury that the College discriminated against him because he is black.

Mack's discrimination claim cannot succeed on the basis of direct evidence. "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Ondricko*, 689 F.3d at 649 (quoting

*Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Mack asserts that Offett overheard a racial slur and did not report it. (ECF No. 19, PageID.276.) He argues, "Racial Slurs or statements suggesting a decision maker relied on race can constitute direct evidence." (ECF No. 19, PageID.274.) Mack also notes that three other College employees have filed discrimination claims with the EEOC, although only one of those complaints concerned a termination related to a felony record. (ECF No. 19, PageID.277; ECF Nos. 19-5, 19-6, 19-7.)

Mack is correct that racial slurs *can* constitute direct evidence. For instance, his brief cites *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241 (6th Cir. 1995), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). In *Talley*, the Sixth Circuit held that racist comments by a restaurant's co-owners about an employee could constitute direct evidence of discrimination. *See* 61 F.3d at 1244, 1249. But the person who made the racial comment here was Walker, a coworker rather than a manager who had the power to fire him. Mack also cites a case that gives examples of direct evidence of discrimination such as: "I fired you because you are disabled" and "[Y]ou're too old to carry the mail." *See Erwin v. Potter*, 79 F. App'x 893, 897 (6th Cir. 2003). By comparison, nobody at the College said that they fired Mack because of his race. Further, the fact that three other College employees have filed EEOC claims—two of which were unrelated to a felony record—falls short of providing *direct* evidence that the College discriminated against Mack, as he claims. So no reasonable jury could find direct evidence of a Title VII violation.

Turning to the indirect evidence claim, the governing test for a single-motive claim (such as this) is the three-part framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *See Redlin*, 921 F.3d at 606. First, the plaintiff has the burden to present sufficient evidence to establish a prima facie case of discrimination. *See id.* To do so, Mack must

demonstrate that he "1) is a member of a protected class; 2) was qualified for his job; 3) suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Id.* at 606–07 (internal quotation marks omitted) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)). Next, the burden of production shifts to the College to provide a legitimate, nondiscriminatory reason for the adverse employment decision. *See id.* at 607. Finally, if the College does so, the burden shifts back to Mack to show that the College's explanation is a pretext for discrimination. *See id.*

Regarding his prima facie case, Mack identifies two adverse actions: the reassignment to tasks like weeding and mopping and his eventual firing.

First, the reassignment plainly could not be considered an adverse action. As a G-4 maintenance worker, Mack's duties included repairing walls, installing electrical lines, and groundskeeping. After Mack complained that he was doing assignments above his pay grade, the campus president confirmed that he should only be given tasks at the G-4 level. Subsequently, he recalls being assigned mopping and weeding (and he posits that the assignments were related to his negative interactions with Ethel Cronk).

To be sure, a "reassignment with significantly different responsibilities" can constitute an adverse action. *See Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012). But Mack never alleges that he was reassigned to a job with significantly different responsibilities. He does not claim, for instance, that mopping and weeding are tasks at the G-2 level rather than standard groundskeeping tasks at the G-4 level. After he complained about doing G-11 work, the campus president made sure that he stopped getting assigned those duties; Mack has not produced any facts that show he was demoted below the G-4 level or that his wages or hours changed. And

even if this were an adverse action, Mack does not identify any similarly situated non-black employee who was treated differently. He does not allege, for instance, that only he was given mopping tasks while a comparable white employee was treated differently.

Moving to Mack's termination, which is indisputably an adverse employment action, it is unclear whether Mack was "replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *See Redlin*, 921 F.3d at 606–07. He has not identified any non-black employee who retained his job at the College despite failing to disclose a felony conviction or otherwise lying on his employment application. With only speculative evidence, his brief merely repeats an anonymous rumor that "Caucasian employees are violating the rules as well and not receiving the same type of discipline." (ECF No. 19, PageID.279.)

Even assuming that Mack could make out a prima facie case, his claim still fails. At step two of *McDonnell Douglas,* the burden shifts to the employer, the College, which explains that it performed a background check of Mack as part of its investigation into his altercation with Melvin Walker. The College then learned of Mack's felony record, which indicated that he had lied on his application and violated the College's policy. "Misrepresentations on an application or resume may constitute a legitimate ground for dismissal." *Algie v. N. Ky. Univ.*, 456 F. App'x 514, 517 (6th Cir. 2012) (citing *Moos v. Square D Co.*, 72 F.3d 39, 43 (6th Cir. 1995)) (holding that an employee's underreporting of his criminal history was a legitimate and nondiscriminatory reason for termination). And that is especially so here, where Mack's application informed him that a false statement was cause for dismissal. So the College can satisfy its burden at step two since Mack violated the College's policy by failing to list his felony conviction on his application.

At step three, the burden shifts back to Mack to show the College's proffered reason was pretextual by demonstrating, for example, that the reason "(1) had no basis in fact, (2) did not

8

actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct." *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009). Mack first says that the College's termination letter "completely contradicts the reasoning proffered by the" College, which said he was fired "because of an altercation he was involved in with Mr. Walker and not because he allegedly lied on an application." (ECF No. 19, PageID.279.) That is plainly incorrect. The letter reads: "During an investigation regarding [the July 6] incident it was found that you violated [College] policy/procedure." In other words, although the altercation led to the investigation, the College fired Mack when it found out that he had violated its policy. Mack then tries a second argument: "[O]ther incidents occurred during the time Mr. Mack was employed which could have resulted in Mr. Mack's termination yet, Mr. Mack was never terminated." (ECF No. 19, PageID.282.) Essentially, Mack protests that the College did not fire him *earlier*, either because he lied on his initial application or for another reason. But nothing suggests that the College fired him because of his race and then fabricated an explanation. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) ("[A] reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." (quotation omitted)). So when it comes to pretext, Mack cannot carry his burden.

Ultimately, Mack's belief that racial discrimination caused his termination is speculative. No reasonable jury could find that Mack has met his burden under *McDonnell Douglas*.

**B.**

Mack's Title VII hostile-work-environment claim fares no better.

To succeed on this claim, Mack must establish 1) that he belongs to a protected class, 2) that he faced "unwelcome harassment," 3) that the harassment was based on Mack's race, 4) that "the harassment was sufficiently severe or pervasive to alter the conditions of employment and

9

create an abusive working environment," and 5) that the College "knew or should have known about the harassment and failed to act." *See Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013) (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)). Prong four ("sufficiently severe or pervasive") establishes a high bar, which requires that the workplace be "permeated with discriminatory intimidation, ridicule and insult." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Mack cannot clear that bar. "[M]ere utterance of an . . . epithet which engenders offensive feelings in a[n] employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (ellipses in original) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). The Sixth Circuit has found "even offensive and bigoted conduct [to be] insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements." *Phillips v. UAW Int'l,* 854 F.3d 323, 328 (6th Cir. 2017) (citing *Williams*, 643 F.3d at 506, 513 (finding no hostile work environment where defendant "call[ed] Jesse Jackson and Al Sharpton 'monkeys' and [said] that black people should 'go back to where [they] came from'" among other racist comments (alterations in original)); *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432 (6th Cir. 2014) (no hostile work environment where plaintiff was subjected to race-based comments and his supervisor stood behind him and made a noose out of a telephone cord); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707–08 (6th Cir. 2007) (fifteen racially-motivated comments and instances of disparate treatment over a two-year period were isolated, not pervasive, and therefore not actionable under Title VII)). And "harassing comments alone" are less severe than "harassment involving an element of physical invasion." *Smith*, 813 F.3d at 309.

Here, Mack's coworker's utterance of the phrase "hoe ass nigga," with nothing more, did not create a hostile work environment. Walker allegedly used the phrase only once. Mack never claims that other coworkers or supervisors used such language. Nor was the remark accompanied by any physical harassment. Ultimately the single utterance of the racial language did not sufficiently affect the conditions of Mack's employment. And Mack's response brief does not argue that the later scuffle or earlier incidents with Cronk or his G-4 tasks contributed to a hostile work environment. Based on the record, no reasonable jury could find that the workplace was permeated with discrimination.

Mack cites no case law to the contrary. Instead, he argues: "A jury could certainly find it extremely offensive for someone much younger to refer to an older African American man" with the term that Walker used. (ECF No. 19, PageID.284.) Maybe so. But the test for a hostile-working-environment claim is not whether a statement was "extremely offensive"; it is whether the harassment was so "severe or pervasive to alter the conditions of employment and create an abusive working environment," *Waldo*, 726 F.3d at 813. The severity (or pervasiveness, if there are multiple comments) must alter the terms of employment. Walker's one isolated comment did not do so.

In conclusion, while Mack says that he was offended by Walker's comment, that alone does not rise to a Title VII hostile-work-environment claim. Because Mack is unable to show severe or pervasive harassment, the Court need not resolve whether the College knew or should have known about the incident. As a matter of law, Walker's insult by itself does not meet the bar of a workplace "permeated with discriminatory intimidation, ridicule and insult." *See Smith*, 813 F.3d at 309.

**IV.**

Mack's claims under Title VII do not proceed to a jury. And under the same framework, neither do his state-law ELCRA claims. The College's motion for summary judgment on all counts (ECF No. 16) is hereby granted.

SO ORDERED.

Dated: May 19, 2020

s/Laurie J. Michelson  
LAURIE J. MICHELSON  
UNITED STATES DISTRICT JUDGE